J-A22017-25 & J-A22018-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| T.L.B. O/B/O B.B.M. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| B.M. | : | No. 875 EDA 2025 |

Appeal from the Order Entered March 18, 2025
In the Court of Common Pleas of Philadelphia County Domestic Relations
at No(s): 2405V7088

| | | |
|---|---|---|
| T.L.B. O/B/O D.B.M. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| B.M. | : | No. 1117 EDA 2025 |

Appeal from the Order Entered March 18, 2025
In the Court of Common Pleas of Philadelphia County Domestic Relations
at No(s): 2405V7089

BEFORE:    LAZARUS, P.J., LANE, J., and STEVENS, P.J.E.*

MEMORANDUM BY LANE, J.:                        **FILED OCTOBER 15, 2025**

We address together the appeals of T.L.B. ("Mother"), on behalf of B.B.M

("Son") and D.B.M. ("Daughter") (collectively, the "Children"), from the orders

_____

* Former Justice specially assigned to the Superior Court.

vacating the temporary Protection From Abuse[1] ("PFA") orders against B.M.

("Father") and dismissing Mother's petitions for final PFA orders.[2]  We affirm.

The trial court summarized the history between the parties:[3]

> Since 2009, Mother and Father have had a longstanding and high-conflict custody dispute over their two children, Daughter (age [sixteen]) and Son (age [ten[4]]).  Custody orders were entered in 2013 and 2016.  Between those years, both parties filed numerous petitions for contempt and requests for home investigations and mental health assessments.  After years of litigating the parties' myriad . . . petitions, a custody order was entered by agreement in 2020.  Father then filed several petitions for contempt, resulting in multiple bench warrants . . . issued for Mother.  Yet another final custody order was issued in 2022[ and] again . . . in 2023.
>
> The current custody order was issued on April 24, 2024 and grants both parties shared legal custody and physical custody for both [C]hildren.

Trial Court Opinion (Daughter's Appeal), 5/14/25, at 1-2 (record citations

omitted and paragraph break added).

Two days after the issuance of the latest custody order, the incident

underlying Mother's instant PFA petitions occurred (discussed *infra*).  At that

_____

[1] *See* 23 Pa.C.S.A. §§ 6101-6122 (Protection from Abuse Act ("PFA Act")).

[2] The trial court filed separate opinions at each child's trial docket, and Mother has filed two briefs, raising slightly different issues pertaining to each child. For ease of discussion, we refer to Mother's appeal at 875 EDA 2025 as "Son's appeal," and Mother's appeal at 1117 EDA 2025 as "Daughter's appeal."

[3] For ease of review, we have amended the trial court's references to D.M.B to "Daughter," and to B.B.M. to "Son."

[4] It appears the custody litigation has spanned almost the entire life of Daughter and predates Son's birth.

time, Daughter was fifteen years old and Son was nine.  Mother filed the PFA petitions on behalf of both minor Children on May 10, 2024.  Following an *ex parte* hearing, the trial court granted "limited temporary PFA order[s] that did not suspend the April 24, 2024 custody order[, nor] preclude Father from having contact with the [C]hildren.  The temporary order merely directed Father not to abuse, harass, stalk, threaten, or attempt or threaten to use physical force against the [C]hildren."  Trial Court Opinion (Daughter's Appeal), 5/14/25, at 3.

The trial court conducted a final PFA hearing on March 18, 2025.[5]  Father and Mother, both represented by counsel, testified, and Mother called two Philadelphia Department of Human Services ("DHS") employees to testify.  Additionally, the two Children testified *in camera*.

First, Mother presented as evidence a prior final, two-year PFA order issued in February 2022, in favor of Daughter and against Father.  This order prohibited Father "from abusing, harassing, stalking, threatening or attempting to threaten to use physical force against Daughter[, but] did not prevent Father from contacting Daughter nor did it supersede the custody order."  **Id**. at 4-5 (record citations omitted).  Mother also presented that PFA's petition, which averred that Father used a butterknife to force open

---

[5] "[T]he parties had mutual contempt of custody petitions . . . scheduled to be heard" the day after, as well as "a modification of custody hearing scheduled for" the following month.  Trial Court Opinion (Daughter's Appeal), 5/14/25, at 4.

Daughter's bedroom door; grabbed her, "shoved her towards [and] down the steps, pushed her onto her back, grabbed her by her ankles, and tried to drag her down the steps." N.T. PFA Hearing, 3/18/25, at 64. Father denied those allegations, claiming instead that Daughter had locked herself in her bedroom, he used a butterknife to unlock the door, and when he entered the room, Daughter's right leg was outside the window and "she appeared to be attempting to step outside onto the ledge. [Father] pulled her back inside." *Id*. at 67-68.

The trial court reasoned that because Mother did not provide the notes of testimony for the 2022 PFA order hearing, it could not "substantiate the exact reason . . . why that PFA was awarded to Daughter." Trial Court Opinion (Daughter's Appeal), 5/14/25, at 5. The court further noted that following that incident, Mother did not take Daughter to a doctor or the hospital, and that the order did not prevent Father from contacting Daughter nor affect the existing custody order. Ultimately, the court credited Father's instant testimony that the 2022 PFA order was based on verbal abuse only.

We now review in detail each of the witnesses' testimony. Father testified to all of the following:

> When the current incident occurred [in April 2024], the children were spending their first full custodial week with Father since 2022[. B]oth children appeared happy[.] Neither one of the [C]hildren had communicated to Father that anything was wrong. However, Daughter had come home from school several hours late each day . . . .. When Father asked Daughter why she was so late[,] she told him that she had become lost and that her phone was not working. When Daughter returned home from school late

again at 7:00 P.M. that Friday, . . . Father decided to talk to her about her tardiness and about an email message [from Mother] that said that Daughter was unhappy.

*Id*. at 5-6 (record citations omitted).

Father further testified to the following. He asked Daughter why she did not tell him how she was feeling, and she replied, "You didn't ask." N.T. PFA Hearing, 3/18/25, at 49. Father told Daughter that if she felt afraid or did not want to be there, he could not keep her against her will, and he offered to take her to Mother's house. Daughter asked if he were "kicking [her] out," and Father denied it. *Id*. Daughter then refused to get in a car with Father, and refused his suggestion to call her mother or grandmother to pick her up. Daughter also said she was not leaving without her brother, but Father responded that he was nine years old and Daughter could not determine where he is "going." *Id*. at 50.

Father described Daughter as "becoming more agitated." *Id*. He told her that if she did not want to call family members to pick her up, he would ask the police to take her home, but this "triggered something."[6] *Id*. at 51. Daughter ran down the hall, "hollering [and] using profanity." *Id*. She ran into the bedroom where Son was; this was the same room where Father had previously observed Daughter with her leg out the window. Father did not want Daughter to "barricad[e] herself" with nine year-old Son inside, and thus

_____

[6] We note Father was previously a police officer, until 2009. *See* N.T., 3/18/25, at 62.

told Son to go to another room. *Id*. at 51-52. "At that point [Daughter] wrap[ped] herself around" Son and said, "You're not taking him anywhere. . . . I'm not letting go." *Id*. at 52. Father sought to separate Daughter and Son. He "grabbed" Son's leg, and when he "was able to free himself," Father told Son again to go to his room. *Id*.

Father's thirty-year old daughter ("I.") was also present, and Father told her to call the police. Father believed that by "that time, [Son] had called the police too." N.T. PFA Hearing, 3/18/25, at 53. Daughter was initially on the bed, but she "rolled onto the floor" and went "limp." *Id*. at 53, 56. Father attempted to restrain her. He testified:

> [Daughter is] calling out [Son's] name, screaming at him to come to her. He's getting upset. And he's screaming, because it's like . . . a panic attack. . . .
>
> . . . He's screaming. She's screaming. And my feeling is I got to . . . maintain some control.

*Id*. Father told Daughter to "relax and calm down." *Id*. Father described:

> [Daughter was] fighting through this the whole time. Struggling back. [S]he's using profanity. I don't think she was deliberately trying to become aggressive [or] trying to strike me.
>
> But [Daughter] was definitely trying to force her way through and to get to [Son]. And from time to time, [Son] would keep coming back. And that would kind of invigorate her to keep coming at [*sic*]. . . .

*Id*. at 54. Father further explained:

> [I] had my arm stretched. Sort of like straddled over her . . . torso[ a]nd keeping her from getting up and going to [Son], or . . . try[ing] to force herself out [*sic*]. [M]y weight [was] not on her,

but the grip is to keep her from moving . . . out of the space where she was being held at.

*Id*. at 55-56.

Father further testified to the ensuing events. After thirty to thirty-five minutes, Daughter "calmed down enough to relax" and she called someone to pick her up. N.T. PFA Hearing, 3/18/25, at 54. Meanwhile, police officers had arrived. Father allowed them in and explained that his daughter wanted to leave. The police asked Daughter to come downstairs, but she declined, stating, "They have guns," and the police left. *Id*. at 54-55. Thereafter, Daughter's aunt and other older half-sister ("P.") arrived and Daughter left with them.

Finally, Father presented a ten-minute video of the incident, taken by his older daughter, I. The trial court summarized: "In the video, Father can be seen using his body to physically restrain Daughter on the floor of the bedroom. Father's physical restraint of Daughter did not establish that Father committed abuse against her or Son." Trial Court Opinion (Daughter's Appeal), 5/14/24, at 7-8.

Next, we review Mother's testimony. She stated: "[Previously, Father] hurt me and beat on me in front of the [C]hildren. [T]he [C]hildren would hide upstairs in their bedrooms, and cover their heads with their blankets until

it was all over. Until I could get them out the house or the cops would intervene."[7] N.T. PFA Hearing, 3/18/25, at 16-17.

With respect to the underlying incident, Mother described what Daughter told her:

> [A]n incident was triggered by an argument in the front bedroom. [Daughter] ran away in tears, because she got upset. [S]he went to go find shelter in the second bedroom with her younger brother and closed the door. [She began] to cry and hug her younger brother. But then [Father] pursued her and came into the room.

*Id*. "Although Mother claimed that she filed a police report, no police report was introduced into evidence. She did not bring Daughter to the hospital or doctor when she was finally returned to Mother's custody." Trial Court Opinion (Daughter's Appeal), 5/14/24, at 8.

Next, Mother called two DHS employees to testify. DHS had investigated a child protective services ("CPS") report about the incident and concluded it was **unfounded**. First, Fatima Garwood ("Garwood") testified to

_____

[7] Mother also testified that when Son calls her from Father's house, he "hides under the bed[ b]ecause he says he doesn't want [Father] to know he's speaking to" her. N.T. PFA Hearing, 3/18/25, at 13. However, the trial court sustained Father's counsel's objection that Mother was merely speculating as to why Son was doing something. *Id*.

The trial court also sustained hearsay objections to Mother's testimony about other incidents that Daughter and Son told her about. *See id*. at 14 (Mother testifying that Daughter told her about "[a] similar situation where [Father] jumped on her back and wrestled her to the floor, so that he could retriever her tablet from her"), 19 (Mother testifying that previously, Son could not pronounce his half-sister I.'s name, and Father "stripped him down until he was naked [a]nd beat him").

the following.[8]  She interviewed the Children at Mother's home five days after the incident:

> Daughter . . . told . . . Garwood that "she didn't want to go back to Father's home due to an incident that occurred in 2021."  [On t]he night in question, Father approached Daughter about an email that [alleged] she did not want to stay with him.  Daughter told Father she did not like the current custody arrangement and that the court[-]ordered seven days of custody was "too much."  [T]his started an argument . . . leading to [Father] restraining [Daughter] "for about an hour."  . . . Garwood did not observe any bruising on Daughter when she met with her five days after the incident, nor did Daughter report any pain or impairment to her.

*Id*. at 8-9 (record citations omitted).

Meanwhile, Son told Garwood that "Father held [Daughter] on the ground for about two hours," and Son "was afraid because of [this] incident."  N.T. PFA Hearing, 3/18/25, at 33-35.  Garwood then interviewed Son a second time, after Son resumed visits with Father, and at that time he had "no concerns" and "wasn't afraid anymore."  *Id*. at 35-36.

Garwood also interviewed Father.  Garwood did not "really know much about" the 2022 PFA order until she met with Father.  *Id*. at 34.  Garwood explained that in concluding "[t]he CPS was unfounded," DHS found that even if Father had restrained Daughter, it was an isolated incident and did not amount to abuse.  *Id*. at 34, 37.

Additionally, DHS intake worker Alvita Davis ("Davis") testified to the following.  She interviewed the Children seven weeks after the incident.

---

[8] Garwood did not state her role in DHS.

Daughter told Davis that she had a disagreement with Father, he "laid on top of her," and she could not breathe. *Id*. at 26. Son stated that Father pulled his leg when trying to separate him from Daughter. Son told Davis "there [were] times when" Father yelled, which made Son "a little nervous." *Id*. at 27. Nevertheless, Davis concluded Son was not in any danger with Father and "[t]here was nothing to substantiate that there was substantial abuse, . . . neglect, or . . . safety issues in the home regarding" Son. *Id*. at 26-27. Son "never said that [F]ather was abusive [or] that [F]ather beat him." *Id*. at 30. Davis told Son she would call him every day when he was at Father's house and check on him, and when she did so, "every day he was fine." *Id*. at 27.

Davis also interviewed Father, who reported that during the incident, Daughter "was out of control" and "trying to get [Son] to leave the home," and "he was trying to get her under control." *Id*. at 29-30. Davis stated the 2022 PFA order was not much of a factor in her "decision to close the DHS investigation," because there was no "evidence to substantiate any type of abuse, or any neglect . . . on [Father's] part." *Id*. at 27-28.

Finally, we review the Children's *in camera* testimony. The trial court summarized Daughter's testimony as follows:

> Daughter clearly prefers being at Mother's home. There, Mother takes care of everything[;] she cooks, does the laundry, and cleans. The [C]hildren have minimal chores at Mother's home. Mother rarely disciplines the [C]hildren, and when she does, she only tells them to do what she wants them to do, such as asking [Daughter] to go to sleep when it is past her bedtime.

Daughter had not been to Father's house since the issuance of the prior PFA in 202[2]. Once that PFA expired and the parties resumed shared custody, both [C]hildren returned to Father's house. Daughter found that it was different than Mother's[.] Father required her to "be more independent." While "he cooked food," Daughter . . . had to do "most of the stuff," giving her more responsibilities at Father's home than at Mother's where everything was taken care of. Even though the limited temporary PFA order did not supersede the parties' equal custody of the [C]hildren, Daughter was allowed to stop contact with Father. She has no desire to develop any sort of relationship with Father in the future.

Trial Court Opinion (Daughter's Appeal), 5/14/24, at 11-12 (record citations omitted and paragraph break added).

Daughter further testified to all of the following. She did not feel safe at Father's house due to "previous incidents around him [*sic*]," she did not want to stay at his house anymore, and she currently did not have any relationship with him. N.T. Child Interviews, 3/18/25, at 9-10. On the day of the incident, Father talked to her about school, "was upset about an e-mail . . . sent by the school," and yelled at her while she tried to stay calm. *Id*. at 11. Daughter felt uncomfortable and told her older half-sister, I., what was happening, but I. did not believe her. *See id*. at 14. Daughter then "went into the room with her brother . . . to just be away from it all." *Id*. at 15. Father came in and held her down, yelling at her. Father held his arm across Daughter's chest and "put his whole body weight on" her, making it hard to breathe. *Id*. at 15. Daughter told "him to please get off [her] as kindly as [she] could," and told him she could not breathe. *Id*. at 16. However, Father held her down and yelled at her for about an hour. *Id*. at 11, 17-18. I. video-

recorded the incident with her phone. Both Father and I. yelled profanities at Daughter. Father also told I. to push Son, who was screaming, into his room and to lock him in there. Daughter passed out and when she awoke, Father was leaving the room. Daughter denied raising her voice or getting physical with Father, but stated she did try to push him away. *See id*. at 29, 42.

Daughter further stated the following. The police arrived, but they allowed her to leave. Meanwhile, Daughter called her grandmother, and her aunt and sister arrived and took her to her grandmother's house. Daughter then stayed at her sister's apartment for a few days because Mother had planned for the Children to stay at Father's that week. *Id*. at 35. Daughter felt tired and anxious, and she did not remember if she had bruising. *See id*. at 32, 37.

Son testified *in camera* to the following. He did not like going to and did not feel safe at Father's house because Father was angry and hurt him and Daughter. *See* N.T. Child Interviews, 3/18/25, at 53. However, he is "forced to" spend a week at his house, and he does not like it. *Id*. at 67. On the night of the incident, Daughter and Father were in another room, and Son "heard muffled yelling." *Id*. at 53. Daughter came into the room, crying, and hugged him. Father "started ripping [them] apart," grabbed Son's leg, and "hurt[ Daughter] on the floor." *Id*. at 55. I. put Son in Father's room, and when Son tried to return to them, he saw Father "pummeling" Daughter on the floor. *Id*. at 56. Daughter could not move or breathe. Son believed this

lasted two hours. Son tried to call 9-1-1, but I. took the phone from him and hung up. *See id*. at 61.

At the conclusion of the evidence, Mother argued that everyone's testimony — including that of Father, both Children, and the DHS witnesses — showed that Father's conduct amounted to false imprisonment under Section 2903(c) of the Crimes Code[9] against both Children. Mother acknowledged that Father and the Children presented different accounts of the incident, but claimed "the truth is often in the middle." N.T. PFA Hearing, 3/18/25, at 74. Mother also claimed that Father frightened the Children.

In response, Father pointed out that he directed I. to call the police, and when they arrived, Daughter chose not to talk with them or report any assault. *See id*. at 71-72. Father maintained that he did not cause nor intended to cause any injuries, and instead, he was "doing what [he] believe[d] his parental duties were, to make sure his children weren't at harm[']s risk." *Id*. at 72.

The trial court denied Mother's petitions for final PFA orders, and it vacated the temporary PFA orders. It found Father had restrained Daughter, but "under these circumstances," it did not rise to abuse supporting a final PFA order. *Id*. at 75. Instead, the court found Father "felt he had an out of

---

[9] *See* 18 Pa.C.S.A. § 2903(c) (defining false imprisonment as a parent's knowingly restraining [their child] unlawfully so as to interfere substantially with his liberty").

control teenager and did what he thought he needed to do to control her." *Id*. The court also found there was no strangulation. It specifically credited Father's testimony, and determined Daughter was not credible. Trial Court Opinion (Daughter's Appeal), 5/14/24, at 11, 16. Relevant to Mother's appeal, the court also stated its belief that Mother's PFA petitions "had a direct impact on" the parties' "contentious child custody litigation," and "[i]f Mother had prevailed[,] it would have given her a distinct tactical advantage in the ongoing custody litigation." *Id*. at 2.

Mother filed timely notices of appeal, along with Pa.R.A.P. 1925(a)(2) concise statement of errors complained of on appeal.

In Daughter's appeal, Mother presents three issues for our review:

I. Did the trial court err by denying [Daughter]. a [PFA] order where the record demonstrated that [Father] abused [Mother] for years in front of her; abused the child previously, for which she obtained a prior PFA Order; and pinned her to the floor for [thirty] to 120 minutes, restraining her body and legs and restricting her breathing?

II. Did the trial court err by denying [Daughter] a [PFA] Order where it found that [Father's] pinning her to the ground for [thirty] to 120 minutes, restraining her body and legs and restricting her breathing constituted reasonable parental discipline?

III. Did the trial court err by denying [Daughter] a [PFA] Order where the record established that [Father's] actions fulfilled the elements of felony false imprisonment against [Daughter]?

Mother's Brief (Daughter's Appeal) at 1 (unnecessary capitalization omitted).

In Son's appeal, Mother presents three issues for our review:

- 14 -

    I.  Did the trial court err by denying [Son] a [PFA] Order where the record demonstrates that [Father] dragged him by the leg and then, with the aid of his eldest daughter, kept [Son] confined to a bedroom after a yearslong course of conduct of domestic abuse?

   II.  Did the trial court err by denying [Son] a [PFA] Order where it found that [Father's] confining him to a room for thirty-five minutes to two hours to prevent him from coming to the aid of his sister, whom [Father] kept pinned to the ground for that duration, constituted reasonable parental discipline of [Son]?

  III.  Did the trial court err by denying [Son] a [PFA] Order where the record established that [Father's] actions fulfilled the elements of felony false imprisonment against [Son]?

Mother's Brief (Son's Appeal) at 1 (unnecessary capitalization omitted).[10]

As all of Mother's issues regarding both Children overlap, we address them together. In sum, she avers the weight of the evidence does not support the trial court's ruling. We consider the applicable standard of review and relevant PFA principles:

> Our standard of review for PFA orders is well settled. In the context of a PFA order, we review the trial court's legal conclusions for an error of law or abuse of discretion.
>
> * * * *
>
> The PFA Act does not seek to determine criminal culpability. A petitioner is not required to establish abuse occurred beyond a reasonable doubt, but only to establish it by a preponderance of the evidence. A preponderance of the evidence standard is defined as the greater weight of the evidence, *i.e.*, enough to tip a scale slightly.
>
> > When a claim is presented on appeal that the evidence was not sufficient to support an order of protection from

_____

[10] Father has not filed a brief at either appeal.

- 15 -

abuse, we review the evidence in the light most favorable to the petitioner and granting her the benefit of all reasonable inferences, determine whether the evidence was sufficient to sustain the trial court's conclusion by a preponderance of the evidence. ***This Court defers to the credibility determinations of the trial court as to witnesses who appeared before it.***

**B.K.P. v. J.R.B.**, 303 A.3d 456, 459 (Pa. Super. 2023) (citations omitted and emphasis added).

Under the PFA Act, a trial court may grant any protection order "to bring about a cessation of abuse of the plaintiff or minor children." 23 Pa.C.S.A. § 6108(a). The PFA Act defines "abuse" to include the following acts:

(2) Placing another in reasonable fear of imminent serious bodily injury.

(3) The infliction of false imprisonment pursuant to 18 Pa.C.S.[A.] § 2903[.]

* * * *

(5) Knowingly engaging in a course of conduct or repeatedly committing acts toward another person, including following the person, without proper authority, under circumstances which place the person in reasonable fear of bodily injury. . . .

23 Pa.C.S.A. § 6102(a). The Crimes Code defines false imprisonment, in part, as follows: "If the victim is a person under [eighteen] years of age, a parent of the victim commits a felony of the second degree if he knowingly restrains another unlawfully so as to interfere substantially with his liberty." 18 Pa.C.S.A. § 2903(c).

Pertinently, this Court has stated in a PFA matter:

- 16 -

> [I]t is not for us to dictate, as a policy matter, how a parent should choose to discipline his or her child.

> * * * *

> [T]his is not to say that [a parent's] actions, regardless of innocent intent, cannot amount to "abuse" within the contemplation of the [PFA] Act. But clearly intent is an important element in the equation. . . . After all, good intentions, regardless of how well founded they are, cannot be an excuse for the frequent infliction of physical or mental pain and/or the terrorizing one's children. Thus, the question as we see it is whether or not [a parent's] conduct constitutes abuse within the meaning of the [PFA] Act.

***Chronister v. Brenneman***, 742 A.2d 190, 192 (Pa. Super. 1999) (footnote omitted).

On appeal, Mother presents extensive arguments challenging the trial court's ruling. She maintains the record evidence established that Father's conduct met three of the five definitions of abuse under the PFA Act: Father falsely imprisoned both Children; Father placed both Children in reasonable fear of imminent serious bodily injury; and Father's course of conduct placed both Children in reasonable fear of bodily injury.[11] In support, Mother first reasons the trial court: "sorely understate[d] the level of physical aggression" Father "used on" the Children; and ignored Father's "course of conduct of . . . physical abuse" against both her and Daughter. Mother's Brief (Daughter's

---

[11] Mother does not argue that Father "attempt[ed] to cause or intentionally, knowingly or recklessly caus[ed] bodily injury[ or] serious bodily injury." 23 Pa.C.S.A. § 6102(a).

- 17 -

Appeal) at 24; *see also* Mother's Brief (Son's Appeal) at 17. Mother

repeatedly cites the Children's account of the incident, that:

> [Father] yelled at [Daughter] as she and her nine-year-old brother
> . . . clutched each other in fear[,] grabbed the boy by the arm and
> leg[,] "ripp[ed him] apart" from his sister[,] and confined the boy
> to another bedroom for . . . over a half hour[, all while Father]
> pinned [Daughter] to the floor, at one point having "straddled" her
> torso, and occasionally leaned one forearm over her chest and
> stomach while [restraining] her legs as she screamed in severe
> emotional distress and physical pain, periodically unable to
> breathe, and leaving both [Daughter] and [Father] "sore" from
> the struggle.

Mother's Brief (Son's Appeal) at 14-15; *see also* Mother's Brief (Daughter's

Appeal) at 14. Mother maintains that Son "witnessed years of [Father's] brutal

physical abuse against" her and Daughter. Mother's Brief (Son's Appeal) at

23; *see also* Mother's Brief (Daughter's Appeal) at 23.

Second, Mother asserts the trial court "erroneously focused on the

abuser's intent rather than . . . the victim's response to the abuser's actions."

Mother's Brief (Daughter's Appeal) at 32-33; *see also* Mother's Brief (Son's

Appeal) at 31-32. Mother reasons that while the trial court found Father did

not strike, punch, or slap Daughter, nor inflict corporal punishment or injuries

onto Son, the PFA Act does not require any of these acts for a finding of abuse.

*See* Mother's Brief (Daughter's Appeal) at 34; *see also* Mother's Brief (Son's

Appeal) at 33. Mother also reiterates, in the alternative, that Daughter fainted

due to Father's conduct, and that Father himself testified that Son suffered a

panic attack during the incident. *See* Mother's Brief (Daughter's Appeal) at

35, 38.

Third, Mother challenges the trial court's reasoning that as a matter of policy, it must not dictate how a parent disciplines his child. Mother reasons that the false imprisonment statute, at subsection 2903(c), criminalizes "behavior by a parent that knowingly restrains his minor child unlawfully so as to interfere with the child's liberty." Mother's Brief (Daughter's Appeal) at 38; **see also** Mother's Brief (Son's Appeal) at 36.

Fourth, Mother challenges the trial court crediting DHS worker Davis' testimony that: (1) Son was not fearful of Father injuring him; and (2) when she called Son at Father's house to check on him, Son said he was fine. Mother denies that Davis made either statement at the hearing.

Fifth, Mother challenges the trial court's observation that should it grant the final PFA orders, she would have a "tactical advantage" in the parties' custody case. Mother's Brief (Daughter's Appeal) at 28; **see also** Mother's Brief (Son's Appeal) at 27. Mother denies she engaged in any "gamesmanship or maneuvering," and maintains that in any event, the PFA Act does not contemplate such a factor. Mother's Brief (Daughter's Appeal) at 28-29; **see also** Mother's Brief (Son's Appeal) at 27.

Finally, Mother acknowledges the trial court's credibility determinations, but maintains "[t]he trial court may not reference a credibility finding as though it were some talismanic phrase that immunizes it from this Court's appellate intervention." Mother's Brief (Daughter's Appeal) at 21 **see also** Mother's Brief (Son's Appeal) at 19-20. Mother insists the record evidence

"flatly and repeatedly contradicts" the trial court's credibility determinations. Mother's Brief (Daughter's Appeal) at 21 **see also** Mother's Brief (Son's Appeal) at 20. Mother thus concludes the trial court abused its discretion in denying her petitions for final PFA orders.

We reiterate that in denying relief, the trial court specifically credited Father's and both DHS workers' testimony, and did not find Daughter's testimony credible. The court first found:

> Mother did not establish that Father engaged in a course of conduct or repeatedly committed acts towards Daughter that would place her in reasonable fear of bodily injury.
>
> Father credibly testified that this was his first custodial week with both [C]hildren after years without any relationship and . . . there was an argument between [him and Daughter], leading to Daughter running into the [C]hildren's bedroom and grabbing her younger brother. She refused to let go of Son and began screaming. Previously in 2021, Father had seen Daughter attempt to leave his house by climbing out of that same second-story window, requiring that he grab her and pull her back into the room to stop her from falling out and injuring herself.[12]
>
> In the instant case, Father was again trying to prevent both minor [C]hildren from jumping out of a second-story window and

---

[12] Elsewhere in its opinion, the trial court stated that in the 2021 incident, Daughter "tried to jump out of the second-floor window." Trial Court Opinion (Daughter's Appeal), 5/14/24, at 1, 4. Mother argues that the record does not support this characterization of jumping. **See** Mother's Brief (Daughter's Appeal) at 24-25; **see also** Mother's Brief (Son's Appeal) at 24-25. However, we note that immediately after the court's above statement, the court also stated that when Father entered the room, Daughter "had one leg out of the window and he stopped her from falling out of the window and getting hurt." Trial Court Opinion (Daughter's Appeal), 5/14/24, at 4. In light of the trial court's extensive discussion of the instant April 2024 incident, we do not view the trial court's discussion about the prior 2021 incident as dispositive and necessitating reversal.

attempted to deescalate the situation by separating the siblings. Daughter began screaming which upset her younger brother. She became aggressive and fought against Father to reach Son, kicking and screaming. Father tried to regain control and prevent Daughter from potentially running away with nine-year-old Son by restraining Daughter and telling her to "relax" and "calm down." . . .

Trial Court Opinion (Daughter's Appeal), 5/14/24, at 15-16 (record citations omitted and paragraph break added).

The trial court also credited both DHS workers' testimony:

. . . Garwood found that Daughter did not like the court ordered custody arrangement where she had to stay with Father for a week at a time[, and that Garwood] believed her interview with Father when he explained that there were multiple instances where Daughter returned home from school late and became aggressive when questioned about it. . . . Furthermore, [Garwood] did not observe any bruising on Daughter when she interviewed her a mere five days after the incident and Daughter did not tell . . . Garwood that she was in any pain. Ultimately, this court determined Ms. Garwood was credible that the argument did not constitute abuse [as] it was a single isolated incident.

. . . Davis also testified credibly. She did not find any "evidence to substantiate any type of abuse or any neglect on [Father's] part." Additionally, . . . Davis believed that Daughter no longer had to return to Father's home, even though the temporary PFA did not prevent her from doing so, [and] it appeared that the parties agreed to let Daughter remain in Mother's custody. As such, any fear that Daughter did express was not a substantial factor in closing the DHS investigation as she was no longer being required by the parties to maintain a relationship with her Father. Finally, . . . Davis'[] testimony that the incident did not give rise to a finding of abuse because "it was just an isolated incident" and "it was not continued or done multiple times" was credible.

*Id*. at 16-18 (record citations and unnecessary capitalization omitted).

For the same underlying reasons, the trial court found that Father's conduct did not amount to false imprisonment under the Crimes Code. The court reasoned that "Father's attempts to restrain Daughter were reasonable and justified." *Id*. at 21. The court stated:

Father saw Daughter run for her younger brother and grab him after she had stated that she wanted to leave his custody. Furthermore, she was in the room that she previously tried to escape out of a second-story window. To prevent Daughter from taking Son out of that same window, Father separated the siblings and told Son to wait in a separate room. This caused Daughter to force her way towards Son and [scream], which caused Son to start screaming as well.

Father had to use his body to prevent Daughter from running and grabbing Son again. He tried to deescalate her temper tantrum by holding her down until she stopped screaming and kicking him. Every time Son emerged from Father's bedroom, she would fight harder against Father. Daughter did not stop trying to force herself toward Son for over thirty minutes. Father felt that he had to restrain her to protect both children. Father did not substantially interfere with Daughter's liberty and any claim stating otherwise is not supported by the evidence. . . .

Trial Court Opinion (Daughter's Appeal), 5/14/24, at 21-22.

Having found that Daughter was screaming and acting aggressively, and that Father was merely attempting to restrain her and have her calm down, the trial court further reasoned that Father's restraining Daughter "to the floor for at least thirty-five minutes constituted reasonable parental discipline." Trial Court Opinion (Daughter's Appeal), 5/14/24, at 18-19 (*citing Chronister*, 742 A.2d at 192). The court found Father did not strike, punch, or slap Daughter, but instead "simply restrained [her] with his arm to prevent her from grabbing her younger brother and leaving the house from the

second-story window, as she had attempted to do in 2021." *Id*. at 19. The court credited Father's testimony "that his intent was not to abuse Daughter but that he was merely reacting to her acting out[.]" *Id*. at 19-20.

After review of the evidence in the light most favorable to Mother, we determine the record supports the trial court's conclusions by a preponderance of the evidence. *See B.K.P.*, 303 A.3d at 459. While Mother correctly points out that a trial court's credibility and weight of the evidence findings are not completely "immunize[d] from" appellate review, we apply our well-settled law that this Court generally defers to a trial court's credibility determinations of the witnesses who appeared before it. *See B.K.P.*, 303 A.3d at 459; *see also* Mother's Brief (Daughter's Appeal) at 21. As discussed in detail above, Father and Daughter presented conflicting accounts of the incident: Father testified that Daughter was physically aggressive and was yelling and cursing. He told her she could leave, either by his or a family member taking her to Mother's house, but she refused while also stating she would only leave with Son. Father attempted to restrain her from leaving and/or taking Son out of the house. Meanwhile, Daughter denied raising her voice or getting physical with Father, and stated she merely tried to push Father away while telling him "as kindly as [she] could" to "please get off [her]." N.T. PFA Hearing, 3/18/25, at 16. The trial court was free to weigh their testimony against the other witnesses' testimony and other evidence presented. We emphasize that the trial court watched a ten-minute video of the incident and found that it showed

Father "using his body to physically restrain Daughter on the floor," and this conduct did not establish abuse. Trial Court Opinion (Daughter's Appeal), 5/14/24, at 7-8. On appeal, Mother presents no argument about the video; she does not claim the video did not accurately represent the incident.

Mother's arguments on appeal are all attempts to persuade this Court to reweigh the testimony in her favor and supplant the trial court's findings of fact with our own. This we cannot do. **See B.K.P.**, 303 A.3d at 459. Instead, our task is to determine whether the record supports the trial court's legal conclusions. After careful review of the record, we conclude the court did not err or abuse its discretion in reviewing all the relevant evidence, including the prior PFA order and the parties' ongoing contentious custody litigation, and finding Father did not: place either child in reasonable fear of imminent serious bodily injury; inflict false imprisonment; or knowingly engage in a course of conduct which placed either child in reasonable fear of bodily injury. **See** 23 Pa.C.S.A. § 6102(a). Accordingly, we do not disturb the trial court's finding that Mother did not establish there was abuse under the PFA Act. We affirm the orders vacating the temporary PFA orders against Father and dismissing Mother's petitions for final PFA orders.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/15/2025